O Mel Royal Houses of Congress.  Weber. Mr.   Garuth.      Ciderteokbokki. Mr. E Yi. Mr. Patience. Mr. Cassidy. Mr. Smith. May it please the court, counsel, good morning. I'm Mike Weston, a lawyer from Cedar Rapids, Iowa, and I represent CMI in this case. On August 22nd of 2016, within three weeks after discovering that Iowa Parts had misappropriated engineering documents containing trade secret materials and had hired a vendor named Climate Engineer to build two silos for asphalt plants, all discovered on February 4th of 2016, this suit was filed. Three weeks after that was discovered. That's the big stuff, right? That's the big stuff. Okay. Now you've known about the little stuff for years. Hadn't you really known about that they were copying the little stuff for years? They were stealing your plans, they were stealing your people, pardon this word, stealing. Your plans, your people, all your stuff was showing up with them for years. Well, here's what we did know, your honor. CMI's predecessor, Terex Corporation, had some isolated incidents where they learned in the record, and there's about five specific facts, which I can get to now, or I can get to later, but each of those were disconnected facts, and what's important is, in their argument, Iowa Parts has conflated knowing about competition with misappropriating trade secrets. There were points, for example, after J. King left the company in February of 2002 and became a portent member at Iowa Parts, Terex sent him a letter and said, remember, you are an employee, you made certain promises, don't break those promises, and oh, by the way, we saw your business card where it uses the word Cedar Rapids like the community where I live, that's kind of close to the name Cedar Rapids, so watch that. But even the trial court, in looking at that letter, said that could be characterized as a routine letter, and importantly, if there would have been investigation at that point, J. King himself testified that he had misappropriated no engineering documents, that any of the work they were doing was to build small parts that could either be bought on the market generically or reversed engineered. So yes, the flagship event, the time when CMI really knew what was going on and knew that they had possession of engineering documents was in February of 2016. And what else did they know at that time? They knew that these engineering documents contained trade secrets, they knew that because J. King had worked with them for years. They knew they had no right to them. They knew that when Terex had sent to vendors, when they went from manufacturing products to sending them to vendors, they sent confidentiality agreements on the masthead or label of every engineering document was a label that said, this is the property of Terex or Cedar Rapids or Standard Havens and can't be used without our permission in writing. They knew that. They also knew that as of 2016, for approximately six years, Iowa Parks had been relabeling these engineering documents, putting their own label on them as if they were theirs. So if an investigation would have been done, say, between 2010 when Mr. Frank told us he started doing that to 2016, we very well could have seen a drawing on the face of it that said it was from Iowa Parks. And they also knew at that time that these engineering documents and their access to them was the basis of their business and they wanted to continue in the future. So they had difficulty. So what they set out to do in their Rule 56 motion was exactly what the court has asked and that said, look at all the points along the way, the exit ramps to the interstate of knowledge where CMI or its predecessor should have investigated. And they did that in three ways. First, they presented about six fact scenarios that the court addressed in its ruling that we'll address in a minute. All of those fact scenarios were weighed by the court and all of them were decided against CMI when the Iowa case law is they should be decided or viewed in the light most favorable to CMI. Second, they conflated, and I'm going to use the term conflated a lot today, I apologize, I'm stuck on it. They conflated their activities as if from very early on they've been using engineering documents and that we should have known it. Rather, through the testimony of some of the people at Iowa Parts, they said how easy it was to reverse engineer and compete for some of the parts. And as I indicated earlier, they conflated the notion of competition, our knowledge of their competition, as if this was a non-compete case as opposed to a theft of intellectual property case. They conflate that in their arguments. We responded to the Rule 56 motion with the allegation of fact of when we first made our discovery in February of 2016 and also pointed out that in each of the five or six fact issues, which I'm going to turn to next, in each of those instances had a different interpretation,  And I would suggest that when the court retires to look at these five or six facts, it will in fact be acting as a jury should, weighing the inferences that can be made, weighing what was known at the time, and that when the court does that, it must do it in the light most favorable to CMI. What were those facts? The first is the letter to J. King, which we've talked about. These were the facts that the court relied on when it ruled that no reasonable jury could find that CMI could not have discovered the theft of intellectual property. The second was testimony from a woman named Cindy Ledford. And Cindy Ledford took over the part sales role after Mr. King left T.E.R.E.X. in 2002. What's interesting is, this was a new job for her. The Cedar Rapids line that was the subject of the questions that she had was new to T.E.R.E.X. It had new parts numbering systems, new products, and she had a difficult time, and said so in her deposition, dealing with it. And while Iowa Parts spins her testimony of one as, wow, something is amiss, it's certainly reasonable to suggest that perhaps she just didn't know her way around the product line. But even stepping back... How long did she work for you? She had worked there for more than five years. Thank you. But she'd only had this parts position for a short time. But another important question for the court is, what would the investigation have been at that time? It's enough to say you should have found out, but what do you find out? If you contact the customer, because this came about with regard to a quote from a customer who wanted to buy a Cedar Rapids part, is there evidence in the record that the customer would know what the vendor who was selling the part was using to make the part? How would the customer know that? How would the customer know whether the engineering documents were being used? How would the customer know if the part was reverse engineered? And so at each of these points of departure, the court has to think, if there would have been an investigation, what could have been learned? And it's easy today to suggest that when you file suit, you have all of the power of discovery and subpoena all available to you. You can flip over the stones. But when you write a letter, like Terex did to Jay King in 2002, and say, hey, remember your role, remember what you're supposed to do, remember your obligations, that person could just say, okay, thanks. The next one was a testimony of Joe Musil. The court, I think, the trial court, misconstrued his testimony. There was discussion about information about parts, parts list, what are called gray books, which is kind of like the owner's manual for an asphalt plant or rock crushing equipment. He testified that those were not specific enough for a person to build a part. And he also testified that he didn't think that many of these parts could be reversed engineered, a point which Iowa Parts vehemently denied. He never provided testimony about when Iowa Parts gained possession of any engineering documents or how they gained possession of any engineering documents. The fourth were trade journals. There's no evidence in the record that anyone from Terex ever saw any ads from Iowa Parts during the time that they were advertising. The trial court, in its order on page 10, said that they implied it, but it's not in the record. And again, if there was a trade journal ad for Iowa Parts, it alerted CMI that they were competing. And there was no non-compete agreement. There was nothing that CMI or its predecessor could do to stop the competition, especially in generic and parts that could be reversed engineered. The notion, the fifth fact, the website, July of 2011. There's no evidence that Terex or CMI saw it. And if and only if the court believes that the website and the creation of a website by Iowa Parts in the summer of 2011 is material, then the conversion and unjust enrichment claims were brought within the five years of the establishment of that website. The sixth fact is how parts are built. All parts are not the same. So when the court looked at, in considering the Rule 56 motion, when the court looked at the facts that were alleged as the off-ramp to investigate why CMI should have discovered the misappropriation of these engineering documents, there's an explanation for each. And most suggest that we were advised or knew that they were competing, but not necessarily misappropriating trade secrets. I'm going to reserve the remaining time. You may. Thank you. Mr. Zarley. May it please the court. My name is Tim Zarley. I'm joined by co-counsel Josh Conley. We represent the APLI, Iowa Parts Incorporated. Your Honors, this is a simple case about engineering drawings. And the primary issue is when did CMI know that there was a problem or potential problem with those drawings? The undisputed evidence shows that they knew right from the very beginning. You just heard the facts on the other side taken favorable to them. Yes. And, of course, your defense is we're so bad, we're good. We were so bad on this and so outrageous and so in your face, he didn't have to go on the on-ramp. He just had to dodge the rock in the middle of the interstate. That's your defense. Now, tell me what's undisputed that bends it your way. Well, first of all, we only took that position for the purposes of this motion. Well, I understand that. But go ahead. But there was one fact that he didn't mention. And, in fact, they haven't even contested it. And it is that in 2002, they knew that employees were leaving CMI Terex and going to work for a direct competitor. And it wasn't just any employee. It was Jay King. And Jay King had been the head of their parts department. He had been the person handling confidential engineering drawings. And recently and rapidly, he had been sending those engineering drawings to vendors for the purpose of quoting parts and making parts. What in the record tells us that? What in the record? That he'd been sending them to the people. There's testimony from Jay King. The record refers to his deposition where he talked about that. How did Iowa know that? How did Iowa know that? Iowa Parts, whatever, drive the wrong party. Sorry. Yes. Okay. How did CMI know that? You're right. Because he was their employee at the time. He left CMI Terex to go to work for Iowa Parts in 2002. And so they knew that that is what he had done for them, and now he'd gone to work for a direct competitor. And the fact, based on his past experience in going to work for a direct competitor, we contend alone supports knowledge that there was a problem, or at the very least a potential problem, that he would use confidential information to help this direct competitor, which triggered the statute of limitations and required a duty to investigate. But there are other things. Wait, wait, wait, wait. Hold a minute. If I have a person who is working for my company and they go to work for a direct competitor, are you saying that at that point, every single time, if the person is a key person in my organization, I have some duty of investigation that arises and that the statute of limitation triggers? At the very least, you have a duty to pay attention, to watch what he's doing, to see what happens. So anytime anybody leaves R&D and goes to another company and works in R&D, the duty arises? When it's a direct competitor doing the same thing that you are, yes. It raises that potential that he would take, especially when he's handling, when he's in charge of handling these confidential documents. It raises, in fact, the Texas Supreme Court has a case that suspicions abound when that fact scenario occurs. The Iowa standard is a reasonable person, right? Standard, would investigate, and I take it you mean a reasonable company would investigate? People within that, reasonable people within that company, yes. This man was doing exactly for CMI what he did when he moved to your company? Yes, exactly the same. Did he actually have a higher position at, now I'll get my parties right, at Iowa Parts, he had a higher position there than at CMI? Didn't he actually have a little higher position? Am I wrong? Tell me. Well, it was different. Iowa Parts was a smaller company, so he didn't have a supervisor, but that's the main difference. Now, even if that weren't enough, shortly after that, within a couple weeks, CMI sends him a letter, and they claim this letter was sent as a matter of course, that it doesn't indicate that he was misappropriating, but that's not the standard in Iowa. The standard is whether they had sufficient knowledge of a problem or a potential problem, and the letter identifies three problems. First problem is there's a potential you're going to use our confidential information, and we don't want you to. This is a letter from CMI. CMI-Terex, to Jay King, personally. Second, it says you're using this confusingly similar tagline, a Cedar Rapids, Iowa company, and we want you to stop. A second problem. And the third problem, and the district court recognized this as the most important problem, is that he had been contacting their customers and the vendors that he had been sending these confidential documents to. So again, we contend that those undisputed facts triggered a positive duty for CMI to investigate. Does the record reflect how many competitors CMI had? They have a lot, or were you the main competitor? I don't know if it's in the record. I do recall Cindy Leffert testified as to who their main competitors were at the time, and she did reference that Iowa Parts was one of their biggest competitors at the time. Now, Mr. Weston talked about, you know, how do you investigate this? And there's a couple different things they could have done. They could have asked for confirmation from Iowa Parts that you're not going to do this anymore. And if Iowa Parts came back and said we're not going to do it, then they would have a concealment defense as to why, you know, they didn't know that they were doing the drawings. They also could have called their vendors and say, are you making parts for Iowa Parts? Are you using our drawings? But there's nothing in the record to suggest that they even tried to do that. Now, in addition to the letter is the testimony of Cindy Leffert. And she was the head of CMI Terex's parts department after J. King left. Can you quote the most damning statement from her, in your view, damning? Basically, she learned of Iowa Parts from her customers because they had been receiving quotes for the same parts more quickly than she had been able to give them to them. And she was concerned by this. And even though she was the head of her department, she was so concerned that she went to her supervisor. Now, I understand that they infer that this, that all she was concerned about was that she couldn't do it as fast as Iowa Parts. But the undisputed part about this statement is that she knew that Iowa Parts was selling the same parts to their customers just shortly after they had told him not to do that. And that, again... And how long is your shortly after? Well, she says right from the beginning. Well, yeah, but that still doesn't help me on months. Months, weeks, days, hours, minutes, seconds, something like that. I believe the closest the record comes is sometime in 2002. And when did King leave? He left in 2002. Iowa Parts started in April of 2002. The letter was in May of 2002, so sometime after that. So, again, this... There's really been no good point to ask this question, but it's something that came through my brain when I was reading the briefs. And I just had this issue, and it keeps kicking around in my head. So I want to ask it, and it may be a complete red herring, and tell me if I'm crazy, I'm fine with that. But it goes like this. If we were to take this intellect, these trade secrets, and we were just to treat them... Imagine a hypothetical where you're looking at patents. And say, I've got a patent for a snowblower, and I've got a patent for a lawnmower. And they're different, right? And so I come to realize that you're... My former employee has appropriated my lawnmower parts, and he's doing stuff for a competitor to help him build lawnmowers. And I just kind of walk away from that. Now, six months later, they decide to make snowblowers, or six years later. It's a different patent, it's a different idea, it's a different secret. Shouldn't the statute of limitations be different, or is it just that if you know the guy's stealing something, you have to assume he's stealing everything? Well, I mean, in your example, you know, there are a lot of hypotheticals as to what the differences are in this technology. We don't have that here. We just have small parts, big parts. Surely that's a disputed fact. They make that distinction, but this isn't a case about parts, it's a case about drawings. And at no point in time have they come forward with any evidence that there is a distinction in the drawings between large parts and small parts. Engineering drawings are engineering drawings, and they are used to make parts. And all of the... In fact, you know, at the time, back in 2002, that statement is inconsistent with CMI-Terex's conduct. CMI-Terex did not distinguish in their NDAs which drawings were for big parts, which were for little, which were OK to use, which weren't. In their letter to Mr. King, they don't distinguish between which drawings are OK and which aren't. And also in this case, in their complaint, they don't distinguish between the drawings, they don't... In discovery, they never distinguish between the drawings, and even in their appeal brief, they didn't distinguish. Does the record indicate how many employees... Your briefs say many times many employees, both of you, but how many employees? Do you know a number left CMI to work for Iowa Parts early to mid-2000s, in that decade? In the early part, there were two, at least two, maybe three. And before 2010, he mentioned Mr. Frank, I think came about 2010. So it could be three to four. Three or four is a fair estimate, OK, of that. Now, mine that I... You heard what Judge Erickson said. Mine, I thought, the whole time is... And Mr. Weston indicated this at the end. Surely they've got some kind of claim for unjust enrichment or something. For some period of time, some claim. Right at the summary judgment stage of this case? Well, no, because this case was brought under the DTSA and the Iowa Trade Secrets Act. And with regards to unjust enrichment, you cannot recover when other adequate remedies are available. And CMI makes no argument that the remedies under the DTSA and the Iowa Trade Secrets Act are inadequate. They simply argue that if they lose on those claims, the unjust enrichment claim is there as a safety net. But that's not the way the statute is written. It's not a reward for losing. The whole purpose of unjust enrichment is when there is no other legal basis to bring a claim or when the remedy of a legal claim is not adequate. It's not there for when you lose. Mr. Weston talked a little bit about the advertisements and websites and things like that. And he mentioned that they didn't see them. But that doesn't matter. Because if they were on inquiry notice, they have a duty to investigate, and they are charged with all knowledge that they would have found out prior to or based on a reasonable and diligent investigation. Iowa Parts wasn't trying to hide what they were doing. They placed advertisements in the exact same publications that CMI-Terex put ads in. They attended the same trade shows that CMI-Terex went to. And on their website, they emphasized that they made the same parts to HMO specifications. Called on the same customers? And they were calling on the same customers, yes. Is CMI noticeably bigger than Iowa Parts during this relevant time period or not? Start back when Mr. King goes there through the present time. Are they noticeably bigger? Do they get to be about the same or can you tell? Just stick to the record. What does the record say? Well, my recollection, and I may have my timing a little off, but Terex purchased Cedar Rapids, I believe, in 2000. And at the time, they had 2,000 employees. And within two years, they'd reduced the workforce to 200. And Iowa Parts was and still is a small company, maybe five, six employees. And CMI-Terex, I don't know the exact number, but it's much larger than that. And you are correct. That was referenced in your briefs and I forgot about it. Okay. I see my time is up. I would ask the court that they affirm the lower court's decision. Okay. Thank you for your argument. We're back to you, Mr. West. Thank you. We'll continue this in 43 seconds. Start at the end. Iowa Parts was open about what they were doing. That's why they remarked the engineering documents with their label and their proprietary information as if they were their own. That's not open. The court asked a very specific question about timing. What was Mr. King doing when he left Terex? When did he acquire these engineering documents? In the appendix at page 180 is an excerpt from his deposition where he said at the time that he received the letter advising him of his obligations as a former employee of Terex, he had taken and had acquired no engineering documents. So at that point, in fact, he responded to the letter. He hired an attorney and responded to the letter and said, I've done nothing wrong. So investigation at that point would have yielded nothing. When did he get them? When did they get them? Well, that is answered in a vague way. What he said in his deposition was at some point along the way, we called a vendor and said, would you build this part for us? We think you have the drawings. And they said yes. And so that's how they operated for four years. And so if we would have gone to the Iowa Parts headquarters for a period of time, we wouldn't have found anything. Another question is this notion of small parts, lawnmower versus snowblower. Iowa Parts was very proud in this case and used it as a defense in discovery that we were smart enough, and the term is over there, with a ruler and a string line, we could reverse engineer these parts. Many of these parts were available generically. Chains, guards, rollers, they were probably upcharged because they came from an authorized dealer or a dealer, but they're generic. You're the plaintiff. Did you plead this as small parts being different than big parts? Didn't have to plead it that way. No, no, did you plead it that way? We did not plead it that way, no. We pleaded that there was a misappropriation of trade secrets. That's how we pleaded in the second amended complaint. Did you make this small parts, large parts argument to the district court? Yes, we did in resistance to Iowa Parts' motion for summary judgment. In their papers, they said we didn't raise it in our motion for summary judgment because we didn't think we had to, but we certainly did in response to theirs. And there's an absolute different situation when a company like Iowa Parts goes out and sells small parts versus parts that can only be built, only be built using hundreds and thousands of complex engineering documents. Now, the court asked this question, and it's a good one. Isn't there some claim that CMI can make? Well, the record is that they continue to get new engineering documents as late as 2017 and that there's testimony from Mr. King that they use them. So there are, in fact, separate misappropriations every time an engineering document is acquired and used to build a new product. The equitable claims made by CMI are safety nets. That's what they're designed for. For example, we don't know what the jury instructions will be because we haven't had a trial, although you've heard a jury argument today about what facts mean. The court might say, jury, you can only award, and I'm out of time if I can finish this thought. You do. Jury, you can only award damages under the Defensive Trade Secret Act or the Iowa Trade Secret Act for specifically proven misappropriation. Unjust enrichment and conversion says to the jury if they derive X amount of profits from the venture, the inappropriate use of these engineering documents, you can award that percentage. Thank you for your time and attention today. Thank you very much. Case number 18-1075 is submitted for decision by the court.